# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 1, 2024

Lyle W. Cayce
Clerk

————————

No. 23-40519

————————

Cure & Associates, P.C.; Premier Wealth & Retirement Management, L.L.C.,

*Plaintiffs—Appellees*,

*versus*

LPL Financial LLC,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:22-CV-311

———————————————————

Before Jones, Clement, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

This case concerns whether nonsignatories to an arbitration agreement may nonetheless be compelled to arbitrate under state-law equitable estoppel principles. Defendant-Appellant LPL Financial LLC (LPL) and Eileen Cure, not a party to this appeal, entered agreements allowing Cure to act as a registered representative under LPL's investment broker-dealer umbrella. Those agreements contained provisions binding LPL and Cure to arbitrate disputes arising out of their relationship. When LPL terminated its relationship with Cure after determining she violated

LPL's policies and code of conduct, Cure and two companies she independently owns—Cure & Associates, P.C., and Premier Wealth and Retirement Management, LLC—each alleged claims against LPL. LPL moved to compel arbitration. The district court granted the motion as to Cure but denied it as to her companies because they were not signatories to the arbitration agreements. The court also declined to stay the action, allowing the companies' claims against LPL to proceed.

LPL appeals, contending that under California and Texas law equitable estoppel principles prevent Cure's companies from avoiding the arbitration provisions. We agree, and therefore reverse the district court's denial of LPL's motion to compel arbitration as to their claims. Likewise, we vacate the district court's order denying a stay of the litigation. We remand for the court to compel arbitration of Cure's companies' claims and to enter a stay pending arbitration.

## I.

## A.

Eileen Cure is a licensed investment advisor and certified public accountant. Until August 2021, she was registered as a broker with the Financial Industry Regulatory Authority (FINRA). From 2018 to 2021, Cure was an independent contractor and registered representative of LPL. LPL is the largest independent broker-dealer in the United States and a FINRA member firm. When Cure contracted with LPL, she brought along her book of business, which grew from approximately $40 million to $56 million during her association with LPL. Cure contracted with LPL in her individual capacity, and the resulting arrangement was terminable at will by either party.

At the outset of their relationship, Cure and LPL executed a Representative Agreement, and a Uniform Application for Securities Industry Regulation or Transfer (Form U4). These documents delineated

that Cure would serve "as a limited agent to solicit purchases of securities and investments offered through LPL in its capacity as broker/dealer." Cure agreed to "conform to the established customs, standards and policies and procedures of the securities industry and LPL," which, among other things, prohibit "employment discrimination against any employee, financial professional, or applicant based on any legal protected status." And she agreed not to "engage in any outside business activity without prior written notification and approval from LPL."[1] The provision in the Representative Agreement governing Cure's "outside business activity" comports with FINRA Rule 3270, which requires written notification of such activity to FINRA.

Shortly after starting work with LPL, Cure submitted several "Outside Business Activity Notification Forms," including forms for Cure & Associates, P.C. (Associates) and Premier Wealth & Retirement Management, LLC (Premier), Appellees here. Cure is the sole owner and operator of both Associates and Premier. Cure formed Premier specifically to conduct her business with LPL, including by using Premier as the vehicle for receiving fees and commissions as detailed in the Representative Agreement. Associates shared employees, clients, and office space with Premier.

Both the Representative Agreement and Form U4 contain similar provisions requiring the parties to arbitrate "any and all disputes, claims or controversies relating to [Cure's] association with or termination from LPL." Per the Representative Agreement, Cure agreed that such disputes

---

[1] According to FINRA, an "outside business activity" is one in which a representative receives or reasonably expects to receive compensation from any business activity "outside the scope of the relationship with his or her member firm." FINRA RULE 3270, OUTSIDE BUSINESS ACTIVITIES OF REGISTERED PERSONS (2015).

"shall be arbitrated in accordance with FINRA rules," and "include, but are not limited to, allegations of unlawful termination" or "sexual or racial harassment or discrimination on the job." That agreement also included a choice-of-law provision stating that California law applies to any such dispute; the Form U4 contains no choice-of-law designation.

In June 2021, Cure interviewed candidates for an open receptionist position at Associates's office in Nederland, Texas. After interviewing one applicant, Cure sent the following message to her office manager through Skype: "I specifically said no blacks. I'm not a prejudiced person, but our clients are 90 percent white, and I need to cater to them, so that interview was a complete waste of my time." An Associates employee took a picture of Cure's message and posted it on TikTok, where the message went viral. Social media users, in turn, pressured LPL to address Cure's message.

On August 4, 2021, following an internal investigation, LPL notified Cure that it was terminating its relationship with her, effective immediately. LPL completed a FINRA Form U5, a Uniform Termination Notice for Securities Industry Registration. The Form U5 required LPL to state its reason for terminating Cure: "Internal communication reflected potentially racially discriminatory hiring/interviewing preferences contrary to [LPL] standards of conduct. Not securities related." LPL also sent Cure's and Premier's clients a letter advising that Cure was "no longer licensed with LPL." In addition, LPL made statements on social media and to news outlets regarding its termination of Cure.

## B.

In August 2022, Cure, Associates, and Premier sued LPL in the Eastern District of Texas. Cure alleged claims for breach of contract, defamation, and tortious interference with a contract, while Associates and Premier each alleged business disparagement. They asserted that LPL's

statements on social media and to news outlets, as well as on LPL's Form U5, unlawfully disparaged them and inhibited their business. In November 2022, LPL moved to compel arbitration and to dismiss the action under Federal Rule of Civil Procedure Rule 12(b)(3),[2] contending that the arbitration provisions in the Representative Agreement and Form U4 covered all three plaintiffs' claims and rendered federal court the wrong venue.

In January 2023, plaintiffs filed an amended complaint that omitted the breach-of-contract claim and instead asserted five causes of action: Cure alleged tortious interference with both existing and prospective contracts; Premier alleged tortious interference with prospective contracts and business disparagement; and all three plaintiffs alleged defamation. Though Cure had dropped her breach-of-contract claim, she "incorporate[d] the facts alleged in [that] claim under her claim of tortious interference." LPL again moved to compel arbitration and to dismiss under Rule 12(b)(3). LPL also moved to stay any claims not compelled to arbitration.

In its motion, LPL argued that because Cure signed the Representative Agreement and Form U4, she was plainly bound to arbitrate her claims. LPL recognized that neither Associates nor Premier signed the arbitration agreements. But LPL reasoned that arbitration of their claims was nonetheless required under state-law equitable estoppel principles. In LPL's view, Associates's and Premier's claims are "inextricably intertwined" with the agreements, thus compelling their arbitration even though the entities did not sign the agreements. Alternatively, LPL asserted that Associates and

---

[2] Federal Rule of Civil Procedure 12(b)(3), which allows a defendant to move to dismiss a claim because of improper venue, is "a proper method for seeking dismissal in favor of arbitration." *McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019).

Premier directly benefited from the agreements and thus cannot now disavow the agreements' requirements, including arbitration of disputes.

The district court construed the Representative Agreement under California law pursuant to its choice-of-law provision. As to the Form U4, the court applied choice-of-law principles of Texas, as the forum state, which require courts to construe contracts under the laws of the state with which the parties have the "most significant relationship." Determining that the parties had the most significant relationship with Texas, the court applied Texas equitable estoppel principles in considering the reach of the Form U4's arbitration provision.

The district court granted LPL's motion to compel arbitration as to Cure but denied the motion as to Associates and Premier. It reasoned that Cure's claims "directly related to her termination from LPL," falling squarely within the arbitration provisions. By contrast, the court concluded that Associates's and Premier's claims sounded in tort law, not contract law. Thus, "[w]hile [their] claims might touch on matters relating to the contracts . . . Premier and Associates will not have to rely on either contract to prove any elements of their claims," rendering equitable estoppel inapt on that basis. The court also analyzed whether the nonsignatory companies could be compelled to arbitrate anyway because they sought and received direct benefits from the contracts. The court found this theory failed too, concluding that Associates and Premier neither sought nor obtained direct benefits from either agreement. Thus declining to compel arbitration of the entities' claims, the district court denied LPL's request to stay the litigation during Cure's arbitration.

LPL appealed the partial denial of its motion. LPL also filed a motion to stay proceedings pending appeal, which the district court granted.

## II.

The main issue on appeal is whether Associates and Premier, though nonsignatories, are bound by the arbitration provisions contained in LPL and Cure's Representative Agreement and Form U4. We conclude they are.

The Fifth Circuit generally reviews de novo a district court's denial of a motion to compel arbitration pursuant to the Federal Arbitration Act (FAA). *Noble Cap. Fund Mgmt., L.L.C. v. US Cap. Glob. Inv. Mgmt., L.L.C.*, 31 F.4th 333, 335–36 (5th Cir. 2022). However, the court "review[s] for abuse of discretion a district court's determination of whether equitable estoppel may be invoked to compel arbitration." *Bufkin Enters., L.L.C. v. Indian Harbor Ins. Co.*, 96 F.4th 726, 729 (5th Cir. 2024) (quoting *Auto Parts Mfg. Miss., Inc. v. King Const. of Houston, L.L.C.*, 782 F.3d 186, 196 (5th Cir. 2015)). "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Id.* (quoting *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). Moreover, while this court generally "review[s] de novo a denial of a motion to stay a proceeding pending arbitration," *Tittle v. Enron Corp.*, 463 F.3d 410, 417 (5th Cir. 2006), we review whether to stay nonsignatories' litigation for an abuse of discretion, *see Rainier DSC 1, L.L.C. v. Rainier Cap. Mgmt., L.P.*, 828 F.3d 356, 360–61 (5th Cir. 2016).

### A.

Generally, under the FAA, only parties to an arbitration agreement are bound by that agreement. 9 U.S.C. § 2. But there are exceptions under which nonparties to an arbitration agreement may be required to arbitrate claims. For instance, "traditional principles of state law may allow an arbitration contract to be enforced . . . against nonparties to the contract through a number of state-contract-law theories, including equitable

estoppel." *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009)).

LPL invokes two equitable estoppel theories, which it contends are viable under both California and Texas law, to support that Associates and Premier should be compelled to arbitrate their claims. First, LPL contends that the companies' claims sound in contract, not tort, and must be arbitrated because they are "inextricably intertwined" with the underlying agreements between LPL and Cure. Alternatively, LPL asserts that even if their claims are tortious in nature, Associates and Premier sought and obtained direct benefits under the agreements, binding them to the agreements' requirements, including arbitration.

Pursuant to the Representative Agreement's choice-of-law provision, California law guides our analysis of its arbitration provision's scope. The Form U4 lacks a choice-of-law provision, but whether Texas or California law governs our analysis of the Form U4's arbitration provision does not change the result. Under the law of both states, Associates and Premier are bound to arbitrate their claims. We examine each estoppel theory in turn.

We begin with LPL's "intertwined with the contract" theory. Under California law, especially when "all of the plaintiffs, signatory and nonsignatory, are related entities," "[a] nonsignatory plaintiff can be compelled to arbitrate a claim . . . when the claim is itself based on, or inextricably intertwined with, the contract containing the arbitration clause." *JSM Tuscany, LLC v. Superior Ct.*, 123 Cal. Rptr. 3d 429, 444–45 (Cal. Ct. App. 2011). And for present purposes, the same is true under Texas law. *See Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 610–12 (5th Cir. 2016) (holding that the Supreme Court of Texas, "if faced with the question, would adopt intertwined claims estoppel," which "involves compelling arbitration when

a nonsignatory defendant has a close relationship with one of the signatories and the claims are intimately founded in and intertwined with the underlying contract obligations" (cleaned up)).

LPL argues that Associates's and Premier's claims, as well as LPL's defenses, are "inextricably intertwined" with the Representative Agreement, requiring the companies to arbitrate their claims. Associates and Premier counter that, as the district court concluded, they cannot be compelled to arbitrate because their claims sound in tort, not contract. We acknowledge that LPL's reasoning has some allure given the interlocking relationship of the plaintiffs and their claims. But because "direct benefits" estoppel more clearly compels Associates and Premier to arbitrate their claims in any event, it is unnecessary to resolve whether the plaintiffs' claims are sufficiently intertwined with Cure and LPL's contract as to require arbitration.

Under California law, "a nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause." *Pillar Project AG v. Payward Ventures, Inc.*, 279 Cal. Rptr. 3d 117, 123 (Cal. Ct. App. 2021) (alteration accepted) (internal quotation marks omitted) (quoting *Boucher v. Alliance Title Co., Inc.*, 25 Cal. Rptr. 3d 440, 444 (Cal. Ct. App. 2005)). Texas law similarly instructs that "a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract" containing the arbitration provision. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005). In assessing that question, courts "focus[] on the nonparty's conduct during the performance of the contract." *Id.* at 132–33.

LPL contends that Associates and Premier both sought and obtained direct benefits from Cure's relationship with LPL. LPL argues that, as a result of the benefits the entities received from the contracts, they are now

equitably estopped from avoiding the burden of the contracts' arbitration provisions. The companies respond that "[t]here is not a sufficient[ly] 'close relationship' between [Cure] and Cure & Associates, or Premier," to sustain a ruling for LPL on the direct-benefits estoppel theory. Viewing the record through the lens of either California or Texas law, we agree with LPL that both companies deliberately sought and received direct benefits from Cure and LPL's contractual relationship, such that their claims are subject to arbitration per those underlying contracts. The district court erred in concluding otherwise.

Start with Premier. Cure formed that company specifically as a vehicle to facilitate her LPL business: She filed Premier's certificate of formation the same day she signed the Representative Agreement and notified LPL that Premier was a "DBA for LPL Business (entity for LPL Business)" for which she would spend 100% of her time working. She funneled through Premier the fees and commissions she earned from her relationship with LPL. Thus, Premier's very existence derived from Cure's Representative Agreement with LPL. And Premier's ongoing business activities—and the revenue to pay its freight—sprang solely from Cure's contractual arrangement with LPL. From its conduct, which was directed by Cure as its sole member, it is clear that Premier "deliberately s[ought] and obtain[ed] substantial benefits from the contract." *Weekley Homes*, 180 S.W.3d at 132. Accordingly, it must arbitrate the claims it alleges in this case.

The result is the same for Associates. This is so despite that it was a preexisting company with other business activities. As she did with Premier, Cure solely controlled Associates. The company shared clients, employees, and offices with Premier. Cure's contractual relationship with LPL thus had the desirable and direct result of reducing Associates' own overhead and expenses. Basically, Associates and Premier leveraged a symbiotic relationship, with Cure as the facilitator of both entities' activities. Tellingly,

as part of the fallout from Cure's fateful Skype message, while Associates lost clients, "[t]he only clients that [it] lost were the clients that were mutual [Premier] clients from LPL[.]"  On these facts, we conclude that Associates, like Premier, received direct benefits from Cure's contracts with LPL, such that it may not avoid the arbitration provisions of those agreements.  *Pillar Project*, 279 Cal. Rptr. 3d at 123; *Weekley Homes*, 180 S.W.3d at 132–33.

### B.

Under Section 3 of the FAA, if a claim in a lawsuit is "referable to arbitration under an [arbitration] agreement," the district court "shall on application of one of the parties stay the trial of the action" pending arbitration.  9 U.S.C. § 3; *see In re Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir. 1993).  Based on its conclusion that the claims asserted by Associates and Premier were not "referable to arbitration," the district court denied LPL's request to stay litigation of the entities' claims pending Cure's arbitration.  Because we conclude that the district court erred in its underlying determination of non-arbitrability, and considering that LPL properly moved to stay the litigation, we vacate the district court's order denying a stay of this action pending arbitration.  *See, e.g.*, *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 659–62 (5th Cir. 1995).  On remand, the district court "shall stay the trial of the action" pending arbitration of the plaintiffs' claims.  9 U.S.C. § 3.

### III.

Even though Associates and Premier were not signatories to the Representative Agreement and Form U4 between LPL and Cure, Associates and Premier are equitably estopped from avoiding the arbitration provisions contained in those agreements.  We therefore REVERSE the district court's denial of the motion to compel arbitration of their claims.

No. 23-40519

Because Associates and Premier must arbitrate their claims, this action must also be stayed pending arbitration. We VACATE the district court's order to the contrary.

Finally, we REMAND for the district court to enter an order compelling arbitration and staying this action in accordance with Section 3 of the FAA.

REVERSED AND REMANDED.